IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN DRYER CORPORATION, )<br>)<br>    Plaintiff/Defendant-in- )<br>    counterclaim, )<br>)<br>vs. )<br>)<br>RAS SYSTEMS, LLC, )<br>)<br>    Defendant/Plaintiff-in- )<br>    counterclaim. )<br>) | CIVIL ACTION NO. 04-11597-RCL |

ANSWER AND COUNTERCLAIM OF RAS SYSTEMS, LLC

NOW COMES defendant/plaintiff-in-counterclaim RAS Systems, LLC ("RAS"), and hereby answers the Complaint of plaintiff/defendant-in-counterclaim American Dryer Corporation ("ADC"):

COMPLAINT

PARTIES

1. RAS states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1.

2. RAS denies the allegations of this paragraph insofar as it alleges that its principal place of business is 1545 Peachtree Street, NE # S700, Atlanta, Georgia. RAS admits the remaining allegations of this paragraph.

3. The allegations of this paragraph constitute a characterization of claims and/or legal conclusions to which no response is required. To the extent a response is deemed necessary, RAS denies the allegations of paragraph 3.

## STATEMENT OF FACTS

4. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent a response is deemed necessary, RAS denies the allegations of paragraph 4.

5. RAS denies the allegations of paragraph 5 insofar as it alleges that RAS is in the business of designing, developing and assembling machines. RAS admits the remaining allegations of paragraph 5.

6. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent a response is deemed necessary, RAS denies the allegations of paragraph 6.

7. RAS states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7.

8. RAS denies the allegations of paragraph 8 insofar as it alleges that ADC's agreement with RAS for the purchase of a MULTIBend RAS 79.26 machine (the "First MultiBend Machine") was in late 2002. RAS admits the remaining allegations of paragraph 8.

9. RAS admits the allegations of paragraph 9 insofar as it alleges that: (a) RAS provided ADC with credit, in return for a machine "trade in," in the amount of $25,000 on the $800,000 purchase price for the First MultiBend Machine; and (b) ADC provided RAS with checks totaling $765,000 during 2002-2003 in payment for the First MultiBend Machine. RAS denies the remaining allegations of paragraph 9.

10. Denied.

11. RAS admits the allegations of paragraph 11 insofar as it alleges that ADC, prior to purchasing the First MultiBend Machine, advised RAS of its intention to use the First

MultiBend Machine in the clothes dryer/dryer part manufacturing process. RAS states that it is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 11.

12. Denied.

13. RAS denies the allegations of paragraph 13 insofar as it alleges that RAS made misrepresentations. RAS states that it is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13.

14. Denied.

15. RAS admits the allegations of paragraph 15 insofar as it alleges that the First MultiBend Machine has, on at least one occasion, malfunctioned. RAS denies the remaining allegations of paragraph 15.

16. RAS admits the allegations of paragraph 16 insofar as it alleges that ADC communicated with RAS during the years 2003 and 2004 regarding malfunctions of the First MultiBend Machine. RAS denies the remaining allegations of paragraph 16.

17. Denied.

18. RAS admits the allegations of paragraph 18 insofar as it alleges that ADC agreed to purchase from RAS a second MULTIBend Center 79.26 machine (the "Second MultiBend Machine") in exchange for payment in the amount of $908,770 minus $10,000 in credit. RAS denies the allegations of paragraph 18 insofar as it alleges that this agreement was entered into by the parties on or about June 26, 2003. RAS admits the remaining allegations of paragraph 18.

19. RAS admits the allegations of paragraph 19 insofar as it alleges that ADC agreed to purchase the Second MultiBend Machine from RAS for $908,770 minus $10,000 in

credit. RAS denies the allegations of paragraph 19 insofar as it alleges that RAS made misrepresentations. RAS states that it is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 19.

20. Admitted.

21. RAS denies the allegations of paragraph 21 insofar as it alleges that ADC contacted RAS in early 2004 about delivery of the Second MultiBend Machine. RAS admits the remaining allegations of paragraph 21.

22. RAS denies the allegations of paragraph 22 insofar as it alleges that the parties agreed that delivery of the substitute for the Second MultiBend Machine would be at a mutually agreed upon time. RAS admits the remaining allegations of paragraph 22.

23. Denied.

24. Denied.

25. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent a response is deemed necessary, RAS admits the allegations of paragraph 25 insofar as it alleges that in or about Spring 2004 ADC sent an e-mail to RAS asking for return of its $100,000 deposit and denies the remaining allegations of the paragraph.

26. Denied.

## COUNT I – BREACH OF CONTRACT – FIRST MULTIBEND MACHINE

27. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-26 of the Complaint.

28. RAS denies the allegations of paragraph 28 insofar as it alleges that ADC's agreement with RAS for the purchase of the First MultiBend Machine was in late 2002. RAS

    admits the remaining allegations of paragraph 28.

29. Denied.

30. Denied.

### COUNT II – BREACH OF CONTRACT – SECOND MULTIBEND MACHINE

31. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-30 of the Complaint.

32. RAS admits the allegations of paragraph 32 insofar as it alleges that ADC agreed to purchase the Second MultiBend Machine from RAS in exchange for payment in the amount of $908,770 minus $10,000 in credit. RAS denies the allegations of paragraph 32 insofar as it alleges that this agreement was entered into by the parties on or about June 26, 2003. RAS admits the remaining allegations of paragraph 32.

33. Denied.

34. Denied.

35. Denied.

### COUNT III – VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 93A

36. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-35 of the Complaint.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

44. Denied.

## COUNT IV – DECEIT AND MISREPRESENTATION – FIRST MULTIBEND METAL BENDING MACHINE

45. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-44 of the Complaint.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

## COUNT V – DECEIT AND MISREPRESENTATION – SECOND MULTIBEND METAL BENDING MACHINE

51. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-50 of the Complaint.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

## COUNT VI – NEGLIGENT MISREPRESENTATION – FIRST MULTIBEND METAL BENDING MACHINE

58. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-57 of the Complaint.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied.

### COUNT VII – NEGLIGENT MISREPRESENTATION – SECOND MULTIBEND METAL BENDING MACHINE

64. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-63 of the Complaint.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

### COUNT VI [sic] – CONVERSION

71. RAS repeats and incorporates by reference its responses to the allegations contained in paragraphs 1-70 of the Complaint.

72. Denied.

73. Denied.

### AFFIRMATIVE DEFENSES

As and for its affirmative defenses, RAS asserts the following:

### FIRST AFFIRMATIVE DEFENSE

ADC's Complaint, or certain portions thereof, fails to state a claim upon which relief can

BO1 15668715.1

be granted.

## SECOND AFFIRMATIVE DEFENSE

ADC's claims are barred by the doctrine of estoppel.

## THIRD AFFIRMATIVE DEFENSE

ADC's claims are barred by the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

ADC's claims are barred by the doctrine of waiver.

## FIFTH AFFIRMATIVE DEFENSE

The damages allegedly suffered by ADC, if any, were due to factors and causes other than, and wholly apart from, any alleged acts or omissions of RAS.

## SIXTH AFFIRMATIVE DEFENSE

ADC's damages were caused in whole or in part by the acts or omissions of third parties, for whom RAS is not responsible.

## SEVENTH AFFIRMATIVE DEFENSE

The injuries complained of by ADC were caused in whole or in part by ADC's own negligence.

## EIGHTH AFFIRMATIVE DEFENSE

If ADC proves that RAS was negligent, as alleged, and that the injuries complaint of were caused by the negligence of RAS, ADC's own negligence was greater than the negligence of RAS, and ADC is barred from recovery.

## NINTH AFFIRMATIVE DEFENSE

The injuries complained of by ADC were caused in whole or in part by ADC's own negligence and any damages allowed should be diminished in proportion to the amount of negligence attributable to ADC.

### TENTH AFFIRMATIVE DEFENSE

RAS asserts that to the extent that it had any duty to ADC, said duty was fully, completely and properly fulfilled in all respects.

### ELEVENTH AFFIRMATIVE DEFENSE

ADC is barred from recovery under the provisions of M.G.L. C. 93A because there is no evidence that RAS committed an unfair or deceptive act or practice within the scope of M.G.L. c. 93A, or a knowing or willful violation of M.G.L. c. 93A.

### TWELFTH AFFIRMATIVE DEFENSE

ADC has failed to mitigate its damages.

### THIRTEENTH AFFIRMATIVE DEFENSE

ADC has failed to plead fraud with the particularity required by Mass.R.Civ.P. 9.

WHEREFORE, defendant/plaintiff-in-counterclaim RAS Systems, LLC, prays:

1. That judgment enter in its favor with respect to the Complaint;

2. That this Court award it costs, including reasonable attorneys' fees; and

3. For such other relief as this Court deems just and proper.

RAS SYSTEMS, LLC, HEREBY DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

### COUNTERCLAIM

### PARTIES

1. Plaintiff-in-counterclaim RAS Systems, LLC ("RAS"), is a limited liability company organized pursuant to the law of Georgia with a principal place of business at 1135 Dividend Court, Peachtree City, GA 30269.

2. Defendant-in-counterclaim American Dryer Corporation ("ADC") is, upon information and belief, a corporation organized pursuant to the law of the Commonwealth of

Massachusetts with a principal place of business at 88 Currant Road, Fall River, Massachusetts.

## FACTUAL ALLEGATIONS

**A.  The First Machine Purchase Agreement**

3. RAS is in the business of marketing, selling and distributing machines for the folding, forming, cutting and bending of metal.

4. ADC is, upon information and belief, in the business of manufacturing clothes dryers and dryer parts.

5. In or about June 2002, ADC and RAS entered into an agreement whereby ADC agreed to purchase an RAS machine known as a "MULTIBend Center 79.26" (the "First MultiBend Machine") for a price of $800,000 (the "First Machine Purchase Agreement"). RAS agreed to provide ADC with a credit of $25,000 on this purchase price in return for ADC "trading in" certain other machines it had previously purchased from RAS. The total amount of cash due from ADC for the First MultiBend Machine was $775,000. Attached at **Exhibit A** hereto, and incorporated herein by reference, is a copy of ADC's purchase order confirming this agreement.

6. RAS provided ADC with the First MultiBend Machine.

**B.  The Second Machine Purchase Agreement**

7. On or about May 5, 2003, ADC requested that RAS provide it with a quotation for the manufacture and delivery of another MULTIBend Center machine.

8. On or about that same date, RAS provided ADC with a written proposal for the purchase of another MULTIBend Center 79.26 machine (the "Second MultiBend Machine"). Copies of relevant portions of this written proposal at attached hereto, and incorporated

herein by reference, at **Exhibit B**.

9. Shortly thereafter, ADC requested that RAS modify this proposal to provide a change in the loading capabilities of the robotic loading system on the Second MultiBend Machine. ADC also requested this same change on the First MultiBend Machine, for which ADC had not yet made full payment. RAS did not believe that this change would be appropriate for these machines for safety reasons.

10. On or about May 21, 2003, ADC and RAS agreed that, in lieu of making ADC's requested loading capability changes, RAS would provide ADC with $10,000 in credit on the purchase price of the Second MultiBend Machine and $10,000 in credit on the amount which remained to be paid by ADC for the First MultiBend Machine and ADC would make the changes themselves. This agreement by RAS was specifically contingent upon ADC purchasing the Second MultiBend Machine. ADC confirmed this arrangement in an e-mail to RAS dated May 21, 2003. A copy of this e-mail is attached hereto, and incorporated herein by reference, at **Exhibit C**.

11. On May 21, 2003, pursuant to the parties' agreement, RAS provided ADC with a revised written proposal for the Second MultiBend Machine (the "May 21 Proposal"). Copies of relevant portions of the May 21 Proposal are attached hereto, and incorporated herein by reference, at **Exhibit D**. The May 21 Proposal offered to sell the Second MultiBend Machine to ADC for a total price of $908,770.00. ADC would also receive $10,000 in credit on this price pursuant to the parties' agreement.

12. The May 21 Proposal provided that ADC would pay one-third (1/3) of the purchase price for the Second MultiBend Machine after providing RAS with a purchase order confirming acceptance of the May 21 Proposal, one-third (1/3) at the time of shipment of

the Second MultiBend Machine to ADC from the RAS factory, and one-third (1/3) upon complete installation of the Second MultiBend Machine at ADC.

13. Attached to the May 21 Proposal were the terms and conditions, entitled "Conditions," under which RAS offered to sell the Second MultiBend Machine to ADC. Paragraph 4 of the Conditions provides that should ADC agree to purchase the Second MultiBend Machine and later cancel the order, ADC will be obligated to pay RAS "(a) all expenses incurred by [RAS] prior to the date of written notice of cancellation, including without limitation direct and indirect expenses, and (b) 30 percent of the price of the goods."

14. On or about May 27, 2003, ADC accepted the May 21 Proposal when it sent a purchase order for the Second MultiBend Machine, Purchase Order No. 31754 ("Purchase Order 31754"), to RAS. A copy of Purchase Order 31754 is attached hereto, and incorporated herein by reference, at **Exhibit E**. This agreement reached by the parties will hereinafter be referred to as the "Second Machine Purchase Agreement."

15. According to Purchase Order 31754, ADC sought delivery of the Second MultiBend Machine by November 30, 2003.

16. ADC breached the Second Machine Purchase Agreement by failing to make payment of 1/3 of the amount due on the Second MultiBend Machine at or about the time it provided RAS with Purchase Order 31754.

17. After waiting three (3) months for this 1/3 payment, RAS, in an effort to get some money from ADC, agreed to revise the terms of the Second Machine Purchase Agreement to provide, among other things, that, in lieu of paying 1/3 of the purchase price up front, ADC would provide RAS with a $100,000 deposit for the Second MultiBend Machine. This deposit was substantially less than the 1/3 purchase price which ADC had agreed to

        pay up front under the Second Machine Purchase Agreement. The parties' agreement was memorialized in a letter from RAS to ADC dated August 19, 2004, which was signed by both parties. A copy of this letter is attached hereto, and incorporated herein by reference, at **Exhibit F.**

18. ADC failed to provide RAS with the $100,000 down payment until on or about September 3, 2003.

C. <u>**RAS's Loan of the Flexibend Machine to ADC**</u>

19. After taking delivery of the First MultiBend Machine, ADC repeatedly failed to operate or maintain the Machine properly. As a result, it ceased to function properly on a number of occasions.

20. In or about late August 2003, ADC asked RAS to loan it another machine so that it could meet certain production needs.

21. In an effort to accommodate ADC's needs, RAS delivered and installed a machine known as a "Flexibend machine" (the "Flexibend Machine") at ADC's facility in Fall River, Massachusetts. Both parties agreed, and at all times understood, that the provision of this Flexibend Machine was a loan and that ADC was obligated to return the Machine to RAS.

D. <u>**ADC's Cancellation of the Second Machine Purchase Agreement And Failure To Make Full Payment For the First MultiBend Machine**</u>

22. Pursuant to ADC's Purchase Order 31754, RAS was prepared to deliver the Second MultiBend Machine to ADC by November 30, 2003.

23. Immediately prior to the delivery date, however, ADC informed RAS that they were not prepared to take delivery of the Second MultiBend Machine because the facility in which the Machine was to be installed was under construction. ADC informed RAS that it

would be able to take delivery of the Second MultiBend Machine in January 2004.

24. When RAS contacted ADC in January 2004, ADC informed RAS that it still could not take delivery of the Second MultiBend Machine because the facility in which the machine was to be installed was still under construction.

25. At or about this same time, RAS informed ADC that it was aware of a third party to whom it could sell the Second MultiBend Machine. Since ADC was still not prepared to accept delivery of the Second MultiBend Machine, ADC requested that RAS sell the Machine to the third party. RAS did so.

26. RAS incurred substantial expenses as a result of ADC's failure to take delivery of the Second MultiBend Machine in November 2003. In addition, RAS incurred substantial expenses as a result of selling the Second MultiBend Machine to a third party.

27. At the time that RAS sold the Second MultiBend Machine to a third party, ADC did not cancel its order of the Second MultiBend Machine, did not withdraw or cancel Purchase Order 31754, did not repudiate the Second Machine Purchase Agreement, and did not indicate in any fashion that it did not intend to purchase a MultiBend Machine from RAS pursuant to the Second Machine Purchase Agreement. Thus, after RAS agreed to sell the Second MultiBend Machine to a third party, ADC remained obligated to purchase a MultiBend Machine from RAS pursuant to the Second Machine Purchase Agreement.

28. Between January 2003 and May 2004, RAS repeatedly asked ADC when it would take delivery of a MultiBend Machine from RAS pursuant to the Second Machine Purchase Agreement.

29. On or about May 14, 2004, RAS received an e-mail from ADC stating, without explanation, that ADC was canceling Purchase Order 31754 and that it would not

purchase a MultiBend Machine from RAS. A copy of this e-mail is attached hereto, and incorporated herein by reference, at **Exhibit G**.

30. Despite the fact that RAS's agreement to provide ADC with $10,000 in credit on the purchase price of the First MultiBend Machine was contingent upon ADC purchasing the Second MultiBend Machine, ADC has paid RAS only $765,000 of the $775,000 owed on the First MultiBend Machine.

**E.    ADC's Conversion Of the Flexibend Machine**

31. In the May 14, 2004, e-mail ADC acknowledged that it was obligated to return the Flexibend Machine to RAS. Shortly thereafter, RAS contacted ADC and requested permission to pick up the Machine at ADC's Fall River facility. However, ADC refused to allow RAS to pick up the Flexibend Machine until RAS returned the $100,000 deposit which ADC had provided to RAS for the Second MultiBend Machine on September 3, 2003.

32. On or about August 24, 2004, after extensive negotiations between counsel for RAS and counsel for ADC, ADC represented to RAS that it would return the Flexibend Machine. A copy of a letter from RAS's counsel confirming this representation is attached hereto, and incorporated herein by reference, at **Exhibit H**. Thereafter, however, ADC again refused to return the Flexibend Machine to RAS unless RAS returned the $100,000 deposit.

33. As of this date, ADC has neglected, failed or refused to return the Flexibend Machine to RAS.

34. Upon information and belief, on each occasion that ADC refused to return the Flexibend Machine it knew or should have known that: (a) it had no rights to the Flexibend

Machine; (b) it was not entitled to a return of the $100,000 deposit on the Second MultiBend Machine; and (c) there was absolutely no relationship between RAS's loan of the Flexibend Machine to ADC and the Second Machine Purchase Agreement.

35. Upon further information and belief, ADC has refused, and is currently refusing, to return the Flexibend Machine in an unlawful attempt to coerce RAS to return the $100,000 deposit for the Second MultiBend Machine. In short, ADC knows or should know that it is not entitled to the return of this $100,000 and that it has no rights to the Flexibend Machine, but is holding the Machine "hostage" in an unfair and deceptive effort to force RAS to return the deposit.

36. As a result of ADC's failure to return the Flexibend Machine, RAS has suffered, and continues to suffer, extensive damages.

## COUNT I
(Breach of the First Machine Purchase Agreement)

37. RAS repeats and incorporates by reference the allegations contained in paragraphs 1 through 36 of the Counterclaim as though fully set forth herein.

38. RAS and ADC, for good and valuable consideration, entered into the First Machine Purchase Agreement.

39. RAS agreed to provide ADC with a credit of $10,000 towards the $775,000 in cash due under the First Machine Purchase Agreement if, and only if, ADC purchased the Second MultiBend Machine.

40. ADC did not purchase the Second MultiBend Machine from RAS.

41. RAS fulfilled all of its obligations under the First Machine Purchase Agreement.

42. ADC has breached the First Machine Purchase Agreement by neglecting, failing or refusing to pay the full amount due thereunder.

43. RAS has suffered damages as a result of ADC's breach of the First Machine Purchase Agreement.

## COUNT II
### (Quantum Meruit – First MultiBend Machine)

44. RAS repeats and incorporates by reference the allegations contained in paragraphs 1 through 43 of the Counterclaim as though fully set forth herein.

45. RAS supplied the First MultiBend Machine for the benefit of ADC.

46. The reasonable value of the First MultiBend Machine, unpaid to date, is $10,000.

## COUNT III
### (Breach of the Second Machine Purchase Agreement)

47. RAS repeats and incorporates by reference the allegations contained in paragraphs 1 through 46 of the Counterclaim as though fully set forth herein.

48. RAS and ADC, for good and valuable consideration, entered into the Second Machine Purchase Agreement.

49. RAS fulfilled all of its obligations under the Second Machine Purchase Agreement.

50. ADC has breached the Second Machine Purchase Agreement.

51. RAS has suffered damages, including but not limited to liquidated damages in the amount of thirty percent (30%) of the purchase price for the Second MultiBend Machine, as a result of ADC's breach of the Second Machine Purchase Agreement.

## COUNT IV
### (Conversion)

52. RAS repeats and incorporates by reference the allegations contained in paragraphs 1 through 51 of the Counterclaim as though fully set forth herein.

53. RAS had possession of, or the right to immediate possession in, the Flexibend Machine.

54. ADC has converted this personal property to its own use by exercising over it a dominion

which is inconsistent with the rights of RAS.

55. As a result of ADC's conversion of the Flexibend Machine, RAS has suffered, and continues to suffer, damages.

## COUNT V
(Breach of M.G.L. c. 93A)

56. RAS repeats and incorporates by reference the allegations contained in paragraphs 1 through 55 of the Counterclaim as though fully set forth herein.

57. RAS and ADC are engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A, Section 11.

58. The acts material to this claim occurred primarily and substantially within the Commonwealth of Massachusetts.

59. The acts of ADC detailed above constitute unfair and deceptive acts or practices in violation of M.G.L. c. 93A, Section 11.

60. The actions of ADC detailed above were undertaken willfully and knowingly.

61. As a result thereof, RAS has suffered damages in an amount not yet ascertained but in excess of $25,000, plus interest, attorneys' fees and costs.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff-in-counterclaim RAS Systems, LLC, prays as follows:

1. That this Court enter judgment in its favor for all damages that may be calculated against the defendant-in-counterclaim American Dryer Corporation as a result of its unlawful conduct;

4. That this Court award it attorneys' fees and costs as allowed by law;

6. That this Court award it treble damages pursuant to M.G.L. c. 93A; and

7. That this Court grant such other and further relief as may be just and proper.

        RAS SYSTEMS, LLC
        By its attorneys,


        /s/ Stephen C. Bazarian_____
        By: Kevin Lesinski (BBO: 554140)
            Stephen C. Bazarian (BBO: 553148)
        SEYFARTH SHAW LLP
        World Trade Center East
        Two Seaport Lane, Suite 300
        Boston, MA  02210-2028
        (617) 946-4800

Date: September 20, 2004


## CERTIFICATE OF SERVICE

     I, Stephen C. Bazarian, Esq., counsel for the defendant/plaintiff-in-counterclaim herein, hereby certify that I served a true copy of the within Answer and Counterclaim upon all counsel of record by hand delivery on the date set forth below.

9/20/04_____          /s/ Stephen C. Bazarian_____
Date          Stephen C. Bazarian, Esq.